Allison C. Bizzano, WSBA 45809  
allison@lotuslawgroup.com  
Matthew Goldberg, WSBA 37410  
matt@lotuslawgroup.com  
Lotus Law Group, LLC  
2 Centerpointe Drive, Suite 345  
Lake Oswego, OR 97035  
Telephone: (503) 606-8930  
Facsimile: (503) 606-8539  

Honorable Michelle L. Peterson

UNITED STATES DISTRICT COURT  
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| Wykanush Ventures, LLC, an Oregon limited liability company; and TCAIXP LLC, d/b/a Eden, an Oregon limited liability company,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>Karstan Walker, a/k/a Karstan Yauchzee, a married person and Kristopher Walker, a/k/a Chris Walker, a married person, and their marital community and Ronald Yauchzee,<br><br>　　　　　　　　Defendants. | Case No. 3:21-cv-05710-DGE-MLP<br><br>DECLARATION OF LASZLO BAGI IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT |

I, Laszlo Bagi, declare and state as follows:

1. I am a member and the manager of Wykanush Ventures, LLC, an Oregon limited liability company ("Wykanush") and the manager of TCAIXP LLC dba Eden, an Oregon limited liability company ("Eden" and together with Wykanush referred to as the "Companies"). I am over the age of 18 and I make this declaration based upon my own personal knowledge.

2. Wykanush operates two Oregon Liquor and Cannabis Commission

("OLCC") licensed recreational marijuana production facilities in Oregon.

3. Eden operates two OLCC licensed recreational marijuana retail stores in Oregon.

4. As the Companies continued to expand, I realized a single person was needed to focus on and keep track of the Companies' finances.

5. In late April or early May 2019, I spoke with Karstan Walker ("Karstan") regarding the open controller position for the Companies. During my conversations with Karstan, she told me that she was an experienced bookkeeper who was familiar with general accounting principles and proficient at using QuickBooks, keeping cash ledgers, and issuing payroll.

6. On or around May 5, 2019, I hired Karstan Walker ("Karstan") as a 1099 contractor to serve as the Companies' controller. Wykanush agreed to pay Karstan $2,000 biweekly, for the total of $52,000 per year, for her services as the Companies' controller.

7. During Karstan's time working for Wykanush, I noticed that she purchased a home, remodeled her home, made large purchases such as cars, and expensive vacations. Karstan had previously told me that her husband's yearly salary had been reduced to $75,000. I discussed her upcoming vacation to Hawaii with Karstan, including the cost, because my wife and I were considering taking a vacation to Hawaii. Karstan told me about the general cost for her vacation and, notably, stated that she had previously received a sizable inheritance from her grandfather. True and correct copies of Facebook posts from Defendant Kris Walker ("Kris"), Karstan's husband, that I printed from his Facebook page related to a home remodel, out-of-state sporting event, and vacation in Hawaii are attached hereto and incorporated herein as Exhibit 3.

8. After Karstan quit, I discovered an email from Karstan's Wykanush email

Page 2 – DECLARATION OF LASZLO BAGI IN SUPPORT
OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

LOTUS LAW GROUP
2 Centerpointe Drive, Suite 345
Lake Oswego, OR 97035
(503) 606-8930

account to a mortgage company with a forged W-2 from Wykanush for Karstan attached to the email. The W-2 appeared to have been issued to Karstan from Wykanush; however, the W-2 was not issued by Wykanush. Karstan was a 1099 contractor – not an employee – and was paid $1,000 per week totaling only $52,000 for an entire year. At the end of 2019, Karstan had only worked for Wykanush for 32 weeks, from May 5, 2019 through December 31, 2019. Wykanush's payments to Karstan for her contract work in 2019 should only total $32,000. A true and correct copy of the forged W-2 is attached hereto and incorporated herein as Exhibit 4.

9. As the Companies' controller, Karstan was responsible for the following: maintaining the Companies' financial records in QuickBooks; receiving, depositing, recording, and tracking the Companies' revenue; and ensuring the Companies' bills were paid including rent, utilities, payroll, federal and state taxes, vendors, suppliers, and other operating expenses.

10. From May 5, 2019 through October 1, 2020, Karstan was responsible for collecting all of Wykanush's receivables. Karstan quit on October 1, 2020, after being questioned about missing bill payments, rent payments, cash deposits, and checks bouncing from the Wykanush bank account.

11. On August 16, 2019, Wykanush opened a bank account with Marion and Polk Schools Credit Union ("MAPS") after it completed the lengthy application process. Prior to August 16, 2019, Wykanush operated as a cash only business. After opening the MAPS account, I intended for Wykanush to pay all of its bills, rent, and payroll out of its MAPS account rather than using cash and I communicated this to Karstan. The only people authorized to withdraw money from Wykanush's MAPS account and authorized

Page 3 – DECLARATION OF LASZLO BAGI IN SUPPORT
OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

LOTUS LAW GROUP
2 Centerpointe Drive, Suite 345
Lake Oswego, OR 97035
(503) 606-8930

signors on Wykanush's MAPS account from August 2019 through September 2020 were Karstan, myself, and Matthew Hanna, Wykanush's in-house counsel at the time.

12. From August 16, 2019 through July 3, 2020, Wykanush used its MAPS account more and cash less to pay its bills, rent, and payroll. After July 3, 2020, Wykanush no longer kept cash-on-hand (petty cash). A true and correct copy of Wykanush's QuickBooks records relating to petty cash from May 2019 through July 2020 (the "Petty Cash Records") are attached hereto and incorporated herein as Exhibit 5.

13. Karstan was the sole person responsible for maintaining the Petty Cash Records beginning in May 2019. The Petty Cash Records have not been altered since Karstan quit on October 1, 2020.

14. To the best of my knowledge, MAPS is the only Oregon bank that allows OLCC licensed marijuana businesses to open bank accounts. MAPS monitors all OLCC licensed bank accounts heavily and with strict scrutiny. To allow MAPS to scrutinize each payment and deposit, MAPS requires all of its OLCC licensed account holders to provide it with monthly Profit and Loss Statements, monthly Balance Sheets, and reports from the Marijuana Enforcement Tracking Reporting Compliance program ("METRC") utilized by OLCC to track marijuana transfers from seed-to-sale. If MAPS finds a discrepancy in the deposits, checks, or financial statements, a MAPS employee will ask for an explanation and clarification regarding the discrepancy. If there are unexplained discrepancies or a business issues a number of bad checks, MAPS may close the account.

15. It is my understanding that once MAPS closes the account of an OLCC licensed business due to unexplained discrepancies or issuing bad checks, MAPS will not allow that same OLCC licensed business to open a new account at MAPS.

Page 4 – DECLARATION OF LASZLO BAGI IN SUPPORT
OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

LOTUS LAW GROUP
2 Centerpointe Drive, Suite 345
Lake Oswego, OR 97035
(503) 606-8930

16. True and correct copies of Wykanush's MAPS' monthly account statements from August 2019 through September 2020 are attached hereto and incorporated herein as Exhibits 6-19, referenced individually below.

    a. Exhibit 6: Wykanush MAPS statement for August 2019;

    b. Exhibit 7: Wykanush MAPS statement for September 2019;

    c. Exhibit 8: Wykanush MAPS statement for October 2019;

    d. Exhibit 9: Wykanush MAPS statement for November 2019;

    e. Exhibit 10: Wykanush MAPS statement for December 2019;

    f. Exhibit 11: Wykanush MAPS statement for January 2020;

    g. Exhibit 12: Wykanush MAPS statement for February 2020;

    h. Exhibit 13: Wykanush MAPS statement for March 2020;

    i. Exhibit 14: Wykanush MAPS statement for April 2020;

    j. Exhibit 15: Wykanush MAPS statement for May 2020;

    k. Exhibit 16: Wykanush MAPS statement for June 2020;

    l. Exhibit 17: Wykanush MAPS statement for July 2020;

    m. Exhibit 18: Wykanush MAPS statement for August 2020; and

    n. Exhibit 19: Wykanush MAPS statement for September 2020.

17. Karstan reported Wykanush's monthly Profit & Loss Statements and Balance Sheets to MAPS from August 2019 through June 2020. Wykanush's July 2020, August 2020, and September 2020 Profit & Loss Statements and Balance Sheets were reported to MAPS using the QuickBooks account that Karstan maintained for Wykanush through October 1, 2020. True and correct copies of Wykanush's monthly Profit & Loss Statements reported to MAPS from January through March 2020 and August through

September 2020 are attached hereto and incorporated herein as Exhibits 20-24, referenced individually below.

        a.    Exhibit 20: Wykanush's January 2020 Profit & Loss Statement;

        b.    Exhibit 21: Wykanush's February 2020 Profit & Loss Statement;

        c.    Exhibit 22: Wykanush's March 2020 Profit & Loss Statement;

        d.    Exhibit 23: Wykanush's August 2020 Profit & Loss Statement; and

        e.    Exhibit 24: Wykanush's September 2020 Profit & Loss Statement.

18. In the summer of 2019, Karstan changed the initial Wykanush contact to herself with the Landlord, Portland General Electric, and MAPS.

19. Because the Companies were repeatedly bouncing checks and financial discrepancies were discovered, which could only be explained by diversion, MAPS closed the Companies' accounts.

20. Wykanush leases property from TKM Investment Properties, LLC, an Oregon limited liability company (the "Landlord") pursuant to a commercial lease agreement (the "Lease"). Pursuant to the Lease, Wykanush leases one of Landlord's commercial properties for $26,874.65 per month in rent.

21. In August 2019, Boverman & Associates, LLC was appointed as the receiver of Landlord's assets (the "Receiver"). Daniel Boverman ("Mr. Boverman") is Wykanush's main contact regarding rental payments to Landlord through the Receiver.

22. Karstan was the main Wykanush contact with the Receiver regarding Wykanush's monthly rental payments due under the Lease until she quit on October 1, 2020.

23. In or around February 2020 or March 2020, Mr. Boverman contacted me

because Wykanush was behind five months of rent payments due under the Lease. I was shocked to learn that Wykanush had not paid rent in five months. Immediately after speaking with Mr. Boverman, I confronted Karstan about the rent arrears. At that time, Karstan told me the Landlord must have made a mistake and that she would contact Mr. Boverman to "take care of it."

24. Around that same time in March 2020, Karstan provided me a blurry printed copy of a cashier's check dated February 21, 2020 to the Landlord for $20,000 (the "Cashier's Check"). A true and correct copy of the Cashier's Check is attached hereto and incorporated herein as Exhibit 25. I later learned that Karstan forged the Cashier's check and that a $20,000 cashier's check was never issued to Landlord or any other person/entity on or around February 21, 2020. True and correct copies of all cashier's checks issued from the Wykanush account are attached hereto and incorporated herein as Exhibit 26. Instead, Karstan withdrew $20,003 from Wykanush's MAPS account on February 21, 2020, without my knowledge or consent, and absconded with the $20,003. A true and correct copy of the withdrawal slip is attached hereto and incorporated herein as Exhibit 27.

25. Mr. Boverman again reached out to me on or around June 1, 2020 regarding Wykanush's failure to pay rent for over 6 months. I immediately reached out to Karstan regarding rental payments and asked for evidence of the payments. On June 3, 2020, Karstan forwarded to me an email that appeared to be from MAPS confirming a wire transfer to Landlord on June 1, 2020. I later learned that she fabricated the alleged email from MAPS after reviewing all of the bank records and not finding any evidence of a wire transfer to Landlord on June 1, 2020. A true and correct copy of the June 3,

2020 email I received from Karstan with forged information regarding an outgoing wire transfer to the Landlord is attached hereto and incorporated herein as Exhibit 28. A true and correct copy of Wykanush's only wire transfer on June 1, 2020, to Columbia River Basin, is attached hereto and incorporated herein as Exhibit 29.

26. On June 4, 2020, Mr. Boverman copied me on an email with Karstan going over the Wykanush rent that remained unpaid. Shortly after Mr. Boverman's June 4, 2020 email, Karstan told me she and Mr. Boverman had figured out the rental payments. Karstan then sent me two emails purporting to be payments to the Landlord. I later learned that Karstan continued to lie to Mr. Boverman and, on July 15, 2020, Karstan even forged a wire transfer request that indicated Wykanush had initiated a wire transfer to Landlord on July 14, 2020 when no such wire transfer request had been submitted or initiated. A true and correct copy of the July 15, 2020 email from Karstan to Mr. Boverman with the forged wire transfer request is attached hereto and incorporated herein as Exhibit 30.

27. True and correct copies of all rent check payments issued to the Landlord that were reversed due to insufficient funds are attached hereto and incorporated herein as Exhibit 31. Karstan issued all of the checks contained in Exhibit 31.

28. In October 2020, after numerous checks issued from the Wykanush MAPS account had bounced, I discovered Karstan had not paid the Receiver and I contacted Mr. Boverman to discuss bringing the rent due under the Lease current.

29. The real property leased by Wykanush receives electricity from Portland General Electric ("PGE").

30. On June 21, 2019, Karstan withdrew $8,924.99 from Wykanush's petty cash, purportedly to pay PGE. However, instead, Karstan retained and absconded with

Page 8 – DECLARATION OF LASZLO BAGI IN SUPPORT
OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

LOTUS LAW GROUP
2 Centerpointe Drive, Suite 345
Lake Oswego, OR 97035
(503) 606-8930

the $8,924.99, without my knowledge or permission, and never paid PGE the $8,924.99.

31. On November 29, 2019, Karstan withdrew $65,000 from Wykanush's petty cash, purportedly to pay PGE. However, instead, Karstan retained and absconded with the $65,000, without my knowledge or permission, and never paid PGE the $65,000.

32. On December 19, 2019, Karstan withdrew $6,000 from Wykanush's petty cash, purportedly to pay PGE. However, instead, Karstan retained and absconded with $3,000, without my knowledge or permission, and never paid PGE $3,000.

33. In October 2020, I learned that PGE had not been paid for numerous months in early 2020 and, as a result, Wykanush was delinquent in payments to PGE in the amount of $76,833.54. A true and correct copy of a letter and spreadsheet I received from PGE in October 2020, evidencing all PGE charges and Wykanush payments on Wykanush's PGE account, is attached hereto and incorporated herein as Exhibit 32.

34. After contacting PGE, I learned that due to a moratorium on shutting off electricity during the pandemic, PGE had not been able to turn off the power due to nonpayment. However, since the moratorium was ending, PGE warned Wykanush that it would be turning off the power due to non-payment.

35. I was surprised to learn PGE had not been paid and was so far behind because Karstan had recently told me that all of the utilities were current and, a few months earlier, Karstan told me that all of the PGE payments were current.

36. In January 2020, Karstan mentioned to me that her father, Ronald Yauchzee ("Ronald"), was having extensive dental work done by a business partner of mine, Kyle Daniels ("Dr. Daniels") in Colorado.

37. On February 20, 2020, Karstan used the Wykanush debit card, without

Wykanush or my consent or approval, to pay Ronald's dental bill in the amount of $2,500 to Kyle Daniels DDS.

38. After discovering the $2,500 payment to Dr. Daniels in Wykanush's MAPS account statement for February 2020, I contacted Dr. Daniels regarding the $2,500. Dr. Daniels confirmed that $2,500 had been credited towards Ronald's account balance owed to Kyle Daniels DDS and sent me an image of the $2,500 payment made for Ronald on his account. A true and correct copy of the image I received from Dr. Daniels evidencing Ronald's $2,500 payment for dental work is attached hereto and incorporated herein as Exhibit 33.

39. As a result of Karstan's theft, Wykanush issued 141 bad checks that were returned due to insufficient funds. Some of the checks returned due to insufficient funds appear to have been issued purposefully by Karstan to allow her to provide true copies of checks to me and to creditors as purported evidence the checks had been issued and "cashed." As a result of the 141 checks returned due to insufficient funds, Wykanush had to pay $3,131 in return check fees and $868 in overdraft fees to MAPS.

40. On October 5, 2019, without my knowledge or consent, Karstan absconded with $4,214.35 from Wykanush's petty cash, indicating it was a reimbursement for alleged purchases for Wykanush's production facilities. However, Karstan rarely visited the production facilities and, because she is not a grower, she would not know what to purchase from Bloom Garden Supply for the production facilities.

41. On November 5, 2019, without my knowledge or consent, Karstan issued a $2,500 payment to herself claiming it was a vendor payment. A true and correct copy of the check dated November 5, 2019, issued to Karstan from Wykanush is attached

hereto and incorporated herein as Exhibit 34.

42. On November 12, 2019, without my knowledge or consent, Karstan issued a $2,500 payment to herself claiming it was a reimbursement. A true and correct copy of the check dated November 12, 2019, issued to Karstan from Wykanush is attached hereto and incorporated herein as Exhibit 35.

43. On February 27, 2020, without my knowledge or consent, Karstan issued a $6,000 payment to herself for her salary, which is $4,000 more than her bi-weekly compensation. A true and correct copy of the check dated February 27, 2020, issued to Karstan from Wykanush is attached hereto and incorporated herein as Exhibit 36.

44. On May 15, 2020, without my knowledge or consent, Karstan issued a $3,000 payment to herself for her salary, which is $1,000 more than her bi-weekly compensation. A true and correct copy of the check dated May 15, 2020, issued to Karstan from Wykanush is attached hereto and incorporated herein as Exhibit 37.

45. On July 2, 2020, without my knowledge or consent, Karstan issued a $8,000 payment to herself for her salary, which is $6,000 more than her bi-weekly compensation. A true and correct copy of the check dated July 2, 2020, issued to Karstan from Wykanush is attached hereto and incorporated herein as Exhibit 38.

46. On November 27, 2019, without my knowledge or consent, Karstan withdrew $3,000 cash from Wykanush's MAPS account and absconded with the funds.

47. On December 5, 2019, without my knowledge or consent, Karstan withdrew $5,000 cash from Wykanush's MAPS account and absconded with the funds.

48. On January 16, 2020, without my knowledge or consent, Karstan withdrew $15,000 cash from Wykanush's MAPS account and absconded with the funds.

49. On February 6, 2020, without my knowledge or consent, Karstan withdrew $3,000 cash from Wykanush's MAPS account and absconded with the funds.

50. On September 24, 2020, without my knowledge or consent, Karstan withdrew $1,000 cash from Wykanush's MAPS account and absconded with the funds.

51. On October 29, 2019, Karstan issued a check to a Wykanush employee, Andrew Hofmeister for his bi-weekly salary in the amount of $1,231.44. However, without my knowledge or consent, Karstan also claimed in the Petty Cash Records that she paid Andrew Hofmeister in cash on October 29, 2019, which I understand he did not receive. A true and correct copy of the October 29, 2019 check to Andrew Hofmeister is attached hereto and incorporated herein as Exhibit 39.

52. On December 20, 2019, Wykanush issued a check to its employee, Julian Emanuel, for his bi-weekly salary in the amount of $724.09. However, without my knowledge or consent, Karstan also claimed in the Petty Cash Records that she paid Julian Emanuel in cash on December 20, 2019, which I understand he did not receive. A true and correct copy of the December 20, 2019, check to Julian Emanuel is attached hereto and incorporated herein as Exhibit 40.

53. On December 20, 2019, Wykanush issued a check to its employee, Paige Powers, for her bi-weekly salary in the amount of $1,496.08. However, without my knowledge or consent, Karstan also claimed in the Petty Cash Records that she paid Paige Powers in cash on December 20, 2019, which I understand she did not receive. A true and correct copy of the December 20, 2019, check to Paige Powers is attached hereto and incorporated herein as Exhibit 41.

54. On December 20, 2019, Wykanush issued a check to its employee,

Christopher Wyble, for his bi-weekly salary in the amount of $791.88. However, without my knowledge or consent, Karstan also claimed in the Petty Cash Records that she paid Christopher Wyble in cash on December 20, 2019, which I understand he did not receive. A true and correct copy of the December 20, 2019, check to Christopher Wyble is attached hereto and incorporated herein as Exhibit 42.

55. On May 8, 2020, Karstan issued a check to a Wykanush employee, Paige Powers, for her bi-weekly salary in the amount of $1,503.04. However, without my knowledge or consent, Karstan also claimed in the Petty Cash Records that she paid Paige Powers in cash on May 8, 2020, which I understand she did not receive. A true and correct copy of the May 8, 2020, check to Paige Powers is attached hereto and incorporated herein as Exhibit 43.

56. From January 1, 2020, through March 31, 2020, Wykanush sold $677,936.41 worth of its products to OLCC licensed companies for resale. However, only $577,269.61 was deposited into Wykanush's MAPS account, its only bank account, or deposited in Wykanush's petty cash. Karstan was the sole person in charge of receiving sales payments, recording the payments, and depositing payments into Wykanush's MAPS account.

///

///

///

///

///

///

57. From August 1, 2020, through September 30, 2020, Wykanush sold $632,313.80 worth of its products to OLCC licensed companies for resale. However, only $598,958.80 was deposited into Wykanush's MAPS account, its only bank account, and no cash was retained for Wykanush's petty cash. Karstan was the sole person in charge of receiving sales payments, recording the payments, and depositing payments into Wykanush's MAPS account.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Vero Beach, Florida on December 19, 2022.

_____
Laszlo Bagi

# CERTIFICATE OF SERVICE

I certify that on the date set forth below I caused to be served a true and correct copy of DECLARATION OF LASZLO BAGI IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT on:

| Karstan Walker<br>12801 NE 13th Ave.<br>Vancouver, WA 98685-3110<br><br>*Pro Se Defendant* | |

By the following method(s):

[X]   by **mailing** a full, true, and correct copy in a sealed, first-class postage-prepaid envelope, addressed to all parties listed above.

[X]   by **electronic service** by filing and serving a full, true, and correct copy to the person listed above via CM/ECF, the Western District of Washington's electronic filing system.

DATED: December 19, 2022             /s/ Allison C. Bizzano
                                     Allison C. Bizzano, WSBA 45809
                                     Matthew Goldberg, WSBA 37410
                                     Lotus Law Group, LLC
                                     2 Centerpointe Drive, Suite 345
                                     Lake Oswego, OR 97035
                                     Phone: (503) 606-8930
                                     Fax: (503) 606-8539
                                     matt@lotuslawgroup.com
                                     allison@lotuslawgroup.com
                                     *Attorneys for Plaintiff*s